IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

TOWANNA THOMPSON                          §
                                          §
        Plaintiff                         §
                                          §
V.                                        §          CIVIL ACTION NO. H-11-4224
                                          §
HARRIS COUNTY, TEXAS and                  §
HARRIS COUNTY HOSPITAL                    §
        Defendant                         §

## MEMORANDUM AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pending in this race and sex discrimination case is Defendant's Motion for Summary Judgment (Document No. 35). After carefully considering the motion, Plaintiff's response (Document No. 41), the summary judgment evidence and each side's objections thereto, and the applicable law, the Court concludes, for the reasons set forth below, that Defendant's Motion for Summary Judgment should be granted.

## I.    Background

This case involves claims of race and sex discrimination under Title 42 U.S.C. Section 2000e et. seq. Plaintiff Towanna Thompson ("Thompson"), an African American female, alleges that she was constructively discharged by her former employer Defendant Harris County Hospital District ("HCHD") as a direct and proximate cause of the unlawful discriminatory employment practices of HCHD.

Thompson was hired by HCHD, an entity of Harris County, Texas, in May 1982, Thompson was hired as a Respiratory Technician in the Respiratory Therapy Department at Ben Taub General Hospital ("Ben Taub"), a hospital within the HCHD. (Thompson Complaint Document No. 15 at 2,3). Thompson received her Bachelor of Science

Degree in Respiratory Therapy from Texas Southern University in 1984, and her Masters Degree in Biology, also from Texas Southern University, in 1995. (Id.)

Beginning in 1985, Thompson began advancing in her career at Ben Taub and by 1990 she was promoted to Operations Manager and Performance Improvement and Education Coordinator. (Id). By 1997, Thompson assumed additional responsibilities in the management of the Electrocardiology (EKG) and the Neurophysiology EEG departments. These responsibilities included the management and/or supervision of over 50 employees.

Throughout her employment, Thompson received exemplary performance evaluations, even going on to be selected out of over 1000 employees for the HCHD's Employee of the Quarter Award for Ben Taub in 1997 and again ten years later in 2007. (Id). In addition to her training by her former supervisor, Director of Respiratory Care, Tom Force ("Force"), Thompson completed a leadership program with the HCHD in 2009, in preparation for the assumption of the Force's position upon his retirement in June 2010. (Thompson Complaint Document No. 15 at 4).

In July 2010, after Force retired, Donna Quin ("Quin"), a white female, was appointed as Administrative Director of the Respiratory Care Department ("RCD"). (Bjarnasan Aff. Document No. 35-8 at 2). Quin assumed the responsibility for the Respiratory Care, Pulmonary Function Lab, Sleep Lab, and EEG departments. (Quin Aff. Document No. 35-7 at 2). Amid concerns about the RCD, including that there were not enough staff to provide sufficient patient care, reports of administrative mismanagement, and concerns by the nursing leadership regarding visibility, assignment and productivity of clinical Respiratory Care Practitioners, (Bjarnason Aff. Document No. 35-8 at 2) Quin

conducted a Strengths, Weakness, Opportunities Threats ("SWOT") analysis of the RCD with the help of an outside vendor. (Quin Aff. Document No. 35-7 at 2). The results showed that the HCHD's RCDs were performing at low-level productivity, there was a lack of employee accountability, and resources were being poorly utilized. (Quin Aff. Document No. 35-7 at 3). Based on the results, Quin found that a reorganization of the RCD was necessary. The goal of the reorganization was to revise job titles, and to compress multiple management roles. (Quin Aff. Document No. 35-7 at 3). This resulted in new job titles for management and a decrease in RCD management positions from nineteen (19) to thirteen (13). (Id).

A new application process was established for affected RCD managers. This process was streamlined as follows:

1. All RCD Managers affected by the re-organization ("Affected RCD Managers") were encouraged to apply for any of the thirteen (13) restructured positions regardless of whether they had credentials for the positions. (Quin Aff. Document No. 35-7 at 3).

2. Leadership Panel Interview- A panel consisting of the HCHD's leadership interviewed each Affected RCD Manager who applied for the restructured position to determine whether he/she possessed the minimum leadership and communication skills necessary to move forward in the interview process. (Id).

3. Final Panel Interview- This panel consisted of both front line leaders including senior nursing leadership and respiratory care practitioners. Immediately following each Final Panel Interview, the respective panel

members met and discussed whether the Affected RCD Manager was a good fit for the positions for which he/she had applied. (Id).

4. Decisions Making Process- Quin made the decision whether to offer a candidate a position. Her decision was based on a combination of her experience as a part of the panel interview, recommendations of other panel members, physician comments and her knowledge of the candidate's past performance and/or her previous interactions with the candidate. Once this decision was made, Quin recommended to the senior executive nursing leadership which candidates she believed were a good fit to receive the restructured positions, recommendations that were ultimately confirmed by the senior executive leadership. (Id at 3-4).

As an affected RCD Manager, Thompson applied for the position of Director of Respiratory Care ("Director") and the position of Clinical Quality Education Coordinator II (CQEC II). (Thompson Dep. Document No. 35-1 at 17). Thompson interviewed for the Director position, but was not extended an interview for the CQEC II position. (Thompson Aff. Document No. 41-6 at 8). Thompson was not chosen for either position. (Id). Instead, she was offered, and subsequently accepted, a Respiratory Care Practitioner III position (Thompson Dep. Document No. 35-1 at 24).  Brian Sanders ("Sanders"), a white male, interviewed for and was offered the Director position (Thompson Document No. 35-1 at 20). Matthew Lewis ("Lewis"), a white male, and Sandra Noworyta ("Noworyta"), a white female, were offered CQEC II positions. (Thompson Dep. Document No. 35-1 at 9). Thompson's new position as a Respiratory Care Practitioner III resulted in a decrease in annual salary from her former position of about 9.9%.

4

(Thompson Aff. Document No. 41-6 at 8-9). After several months in her new position, Thompson resigned and obtained a new position in May 2011 as the Respiratory Diagnostics Coordinator at the Michael E. Debakey VA Medical Center. (Thompson Dep. Document No. 35-1 at 26). Thompson's annual compensation for this position is approximately $76,000, $25,000 to $35,000 less per annum than the position she previously held or claims she was qualified for with HCHD. (Thompson Aff. Document No. 41-6 at 9).

According to Thompson, the reasons given for her not being selected for the Director and CQEC II positions were: her goals were not in accord and did not line up with the district's plans; she gave too high evaluation scores to staff to which she was in charge, and she failed to do anything to make changes within the department during a particular month. (Thompson Complaint Document No. 15 at 5). HCHD, however, maintains that Thompson was not selected for the Director of CQEC II positions for the following reasons: (1) inadequate responses to questions posed to Thompson during the Final Panel Interview; (2) feedback from physician stakeholders; and (3) Quin's knowledge of the candidate's performance and/or her previous interactions with Thompson. (Quin Aff. Document No. 35-7 at 4-5 and 58-59). (Quin Dep. Document No. 35-2 at 23-24).

HCHD argues in its Motion for Summary Judgment that summary judgment is warranted on Thompson's sex and race discrimination claim and constructive discharge claim because HCHD has articulated legitimate, nondiscriminatory reasons for Thompson not being promoted. Thompson argues in her response in opposition to HCHD's Motion for Summary Judgment that these reasons are mere pretext and not

legitimate non-discriminatory reasons for HCHD not selecting her for the Director or CQEC II positions. While Thompson, at times, refers to her not being selected for the Director or CQUEC II positions as a "demotion" from her former position, because all managerial positions in the RCD were effectively eliminated with the restructuring, the affected personnel being encouraged to apply for the new positions, Thompson's non-selection for the Director and CQUEC II positions will be considered herein as a "failure to promote".

## II.    Summary Judgment Standard

Rule 56(c) provides that "[summary judgment] shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A party seeking summary judgment bears the initial burden of informing the district court of the basis for the motion, and identifying those portions of the pleading, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which the moving party believes demonstrate the absence of a genuine issue of material fact. *Celotex Crop. v. Catrett*, 106 S. Ct. 2548, 2554 (1986).

Once the movant carries this burden, the burden shifts to the nonmovant to show that summary judgment should not be granted. *Id.* at 2553-2554. A party opposing a properly-supported motion for summary judgment may not rest upon mere allegations or denials of his pleading, but must set forth specific facts showing the existence of a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2514-15 (1986). Unsubstantiated assertions that a fact issue exists will not suffice. *See Krim v. BancTexas*

*Group, Inc.*, 989 F.2d 1435, 1442 (5th Cir. 1993); *Thomas v. Price*, 975 F. 2d 231, 235 (5th Cir. 1992). The nonmovant "must adduce admissible evidence which creates a fact issue concerning the existence of every essential component of that party's case." *Krim*, 989 F. 2d at 1442.

In considering a motion for summary judgment, the district court must view the evidence through the prism of the substantive evidentiary burden. *Anderson*, 106 S. Ct. at 2513-14. All justifiable inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co., Ltd v. Zenith Radio Corp.*, 106 S. Ct. 1348, 1356 (1986). "If the record, viewed in this light, could not lead a rational trier of fact to find" for the nonmovant, summary judgment is proper. *Kelley v. Price Macemon, Inc.*, 992 F. 2d 1408, 1413 (5th Cir. 1993), *cert. denied*, 114 S. Ct. 688 (1994), *citing Matsushita*, 106 S. Ct. at 1351. On the other hand, if "the factfinder could reasonably find in [the nonmovant's] favor, then summary judgment is improper." *Id.*, *citing Anderson*, 106 S. Ct. at 2511.

Finally, even if the standards of Rule 56 are met, a court has discretion to deny a motion for summary judgment if it believes that "the better course would be to proceed to a full trial." *Anderson*, 106 S. Ct. at 2513. *Accord, Veillon v. Exploration Services, Inc.*, 876 F.2d 1197, 1200 (5th Cir. 1989); 10A C. Wright, A. Miller & M. Kane, <u>Federal Practice and Procedure</u> § 2728 (1983).

## III.    Discussion—Race and Discrimination Claims

Title VII proscribes an employer from discharging or otherwise discriminating against any individual because of such individual's sex or race. *42 U.S.C. § 2000e-2(a).*

To establish a *prima facie* case of discriminatory failure to promote under Title VII, a plaintiff must show that: (1) she was not promoted; (2) she was qualified for the position she sought; (3) she fell within a protected class at the time of the failure to promote; and (4) the defendant either gave the promotion to someone outside of that protected class or otherwise failed to promote the plaintiff because of her race/sex. *Price v. Fed. Express Corp.*, 283 F.3d 715, 720 (5th Cir. 2002).

Once the plaintiff establishes a *prima facie* case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions. *Reeves v. Sanderson Plumbing Prods., Inc.*, 120 S. Ct. 2097, 2106 (2000). The burden on the employer at this stage "is one of production, not persuasion; it 'can involve no credibility assessment.'" Id. (quoting *St. Mary's Honor Ctr. V. Hicks*, 113 S. Ct. 2742, 2748 (1993)). If the employer sustains its burden, the *prima facie* case is dissolved, and the burden shifts back to the plaintiff to establish either: (1) that the employer's proffered reason "is not true, but is instead a pretext for discrimination (pretext alternative)"; or (2) the employer's reason, while true, is not the only reason for its conduct, and another "motivating factor" is the plaintiff's protected characteristic (mixed-motive alternative). *Rachid v. Jack in the Box*, 376 F.3d 305, 312 (5th Cir. 2004). If the plaintiff "demonstrates that [her protected characteristic] was a motivating factor in the [employer's decision to terminate her], it then falls to the [employer] to prove 'that the same adverse employment decision would have been made regardless of discriminatory animus.'" *Id.* (quoting *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207. 1217 (5th Cir. 1995)). If the employer fails to carry this burden, the plaintiff prevails. *Id.*

A plaintiff such as Thompson must either offer direct evidence in support of a claim of discrimination or utilize the direct method of proof set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 702, 802 (1973). *See Taylor v. Principal Fin. Group, Inc.,* 93 F.3d 155, 162 (5th Cir.), *cert. denied,* 519 U.S. 1029 (1996); *Daigle v. Liberty Life Ins. Co.,* 70 F.3d 394, 396 (5th Cir. 1995). "Direct evidence of discrimination is evidence which, if believed, would prove the existence of a fact (i.e., unlawful discrimination) without any inferences or presumption." *Bodenheimer v. PPG Indus. Inc.,* 5 F.3d 955, 958 (5th Cir. 1993). For a statement to suffice as direct evidence of discrimination, the statement must directly suggest the existence of bias and must not be subject to interpretation as anything other than a reflection of bias. *See Mooney v. Aramco Svcs. Co.,* 54 F.3d 1207, 1217 (5th Cir. 1995) (citing *Davis v. Chevron U.S.A. Inc.,* 14 F.3d 1082, 1085 (5th Cir. 1994)). This is not a direct evidence case. As such, this case will be considered under the burden-shifting analysis developed in *McDonnel Douglas.*

## A. Prima Facie Case

As conceded by HCHD, Thompson has established a *prima facie* case of race/sex discrimination. She was not promoted, she was qualified for the Director position, as an African American female, she fell within a protected class at the time of the failure to promote and HCHD gave the promotion to Sanders, a white male, who is outside her protected class.

## B. Legitimate, Non-Discriminatory Reason

HCHD has articulated legitimate non-discriminatory reasons for not promoting Thompson. These articulated reasons include: (1) inadequate responses to interview questions during the panel interview (2) feedback from physician stakeholders and (3)

Quin's knowledge of Thompson's past performance and her previous interactions with Thompson.

### C. Pretext/Mixed Motive

#### 1. Pretext

Thompson contends that HCHD's reasons for not selecting her for the Director and CQEC II positions are mere pretext and her sex and/or race was a motivating factor in her being denied a promotion.

Thompson asserts that she was more qualified for both the Director and the Clinical Quality Education Coordinator II positions than Sanders, Lewis, and Noworyta. Thompson asserts that because she met the qualifications[1] for both positions, her demotion was due to unlawful discriminatory practices by HCHD. The Court agrees with

---

[1] Director of Respiratory Care Minimum Qualifications:
1. Education/Licensure/Specialized Training
   a. Education: Graduation from an accredited School of Respiratory Care with A Masters degree in Respiratory Care or related field.
   b. Licensure/Certification: Applicable professional certification is to be completed within two (2) years, if not held at the time of appointment.
2. Work Experience: Five (5) years of Respiratory Care experience with at least three (3) years work experience in related clinical area of practice.
3. Management Experience: Two (2) years related management/leadership experience is required.
See HCHD MSJ Job Description Exhibit Document No. 35-14 at 1.
Clinical Respiratory Quality/Education Coordinator II Minimum Qualifications:
1. Education/Licensure/Specialized Training:
   a. Education: Graduation from an accredited school of Respiratory Therapy with a Bachelor's Degree. Masters degree in Respiratory Therapy or related field is required.
   b. Licensure/Certification: Certification in clinical specialty is to be completed within two (2) years, if not held at the time of appointment. RCP, RRT, ACLS, PALS, or NRP; and Current license or valid permit to practice respiratory therapy in the State of Texas
2. Work Experience:    Five (5) years of work experience in related clinical area of practice.
3. Management Experience:  Related education/leadership experience preferred.
See HCHD MSJ Job Description Exhibit Document No. 35-14 at 47.

HCHD that Thompson has failed to raise a material question of fact about whether she was clearly better qualified than Sanders or Lewis, as Thompson's qualifications do not "leap from the page and cry out to all who would listen that she was vastly—or even clearly more qualified for the subject job". *See Price,* 283 F.3d at 723 (quoting *Odom v. Frank,* 3 F.3d 839, 847 (5th Cir. 1993).

Thompson holds a Bachelor of Science Degree in Respiratory Therapy and a Masters Degree in Biology. (Document No. 41-6 at 2). With 29 years of experience[2], Thompson satisfies the minimum qualifications of work and management experience for the Director position.

Sanders, who was ultimately selected as the Director, holds a Bachelor's of Education degree, an Associate of Applied Science in Respiratory Care, and a Masters in Business Administration (MBA). (Document No. 35-4 at 4). Sanders's experience[3] satisfies the minimum qualifications of work and management experience for the Director position, as well.

---

[2] Prior to the Fall of 2010, Thompson held the following positions:
- Staff Therapist, Ben Taub General Hospital, 1982 -1985
- Supervisor, Ben Taub General Hospital, 1985-1986
- Clinical Instructor, Texas Southern University, 1985-1986
- Operations Manager/Education and Performance Improvement Coordinator, Ben Taub General Hospital, Respiratory Care/Pulmonary Function/EKG/EEG
- Operations Manager, Ben Taub General Hospital, EEG, 2007-09/2010
  *See* Thompson Resume Document No. 35-1 at 65-67.

[3] Sanders worked in many leadership roles in Respiratory Care, including:
- Director of Respiratory Care and EEG Department, 05/2010 to Fall 2010
- Manager, Pulmonary Rehab/Pulmonary Function, Toledo & Toledo Childrent's Hospital, 1997-2009
- ProMedica System Project Director, 2006-2009
- Manager- Hyperbaric Medicine Department, Toledo & Toledo Children's Hospital 1999-2003
- Supervisor/Clinical Specialist Main Respiratory Care Area, Toledo & Toledo Children's Hospital 1982-1997

*See* Quin Aff. Document No. 35-4 at 27-31.

Lewis, who ultimately was selected for one of the CQEC II positions, has the experience[4] that satisfies the minimum qualifications. In her affidavit, Quin testified that she weighed Lewis's vast technical competencies and a unique ability to respond to complex medical issues greater than his performance in his Leadership Panel Interview. (Quin Aff. Document No. 35-7 at 6). She further testified that because the CQEC II position is a technical-based position that does not require much leadership ability and communication skills, she made the recommendations to the senior executive leadership to allow Lewis to advance to the Final Panel Interview. (Id). It was during this Final Panel Interview that he was able to clearly articulate and provide examples of his various past accomplishments relevant to the CQEC II position that ultimately led to his promotion. (Id).

Noworyta was selected for the other CQEC II position. Noworyta has a Master's degree in Intensive Respiratory Care from Emory University and has been with the HCHD for 35 years.[5]

Having considered the summary judgment evidence, it cannot be concluded on this record that Thompson was clearly more qualified than those selected for the Director and CQEC II positions. *See Price,* 283 F.3d at 723 (quoting *Odom v. Frank,* 3 F.3d 839, 847 (5th Cir. 1993).

---

[4] Lewis's experience includes:
- Assisting in the clinical build of EPIC (electronic medical record system) for the RCDs
- Active involvement in initiatives related to equipment selection and patient care
*See* Quin Aff. Document No. 35-7 at 6-7.
[5] Noworyta's experience includes: Supervisor-1977/78, Operations Manager-1990. *See* Noworyta Dep. Document No. 35-6 at 4.

As articulated by HCHD, and supported with summary judgment evidence, Thompson was not better qualified based on (1) inadequate responses to interview questions during the panel interview (2) feedback from physician stakeholders and (3) Quin's knowledge of Thompson's past performance and her previous interactions with Thompson. Each of these reasons and summary judgment evidence in the record associated therewith, is discussed in detail below.

### a. Inadequate Responses to Questions Posed to Thompson During the Final Panel Interview

During the Final Panel Interview, Thompson was unable to articulate adequate responses to questions posed by the panel.  Thompson was unable to articulate adequate answers to questions about methods to increase department productivity, the goals placed on quality, financial and patient satisfaction that would be relevant to the position she desired, important concepts, research and/or principles relevant to the Director position, including relevant Respiratory Care Practitioner related benchmarks and quality indicators such as ventilator days and ventilator associated pneumonia protocols. (Quin Aff. Document No. 35-7 at 4-5). Members of the panel also found that Thompson presented an unorganized communication style and her responses did not sufficiently demonstrate how her leadership impacted the Department or met the organizational goals of the Department. (Richard Aff. Document No. 35-10 at 2).  The majority of the panel members concluded that Thompson should not move forward for consideration for the leadership positions as evidenced in Thompson's Assessment Tool Summary. (Candidate Assessment Tool Exhibit Document No. 35-12 at 24).

Thompson explains her poor responses to the questions posed to her during the Final Panel Interview were due to not feeling well during the interview. (Thompson Dep. Document No. 35-1 at 23). Ms. Carol Oddo ("Oddo") further testifies that after Thompson's interview, Thompson informed her that she did not have a good interview because she was not feeling well. (Oddo Dep. Document. No. 35-5 at 11).

However, this information does not provide direct evidence of discrimination. Thompson feeling ill during her Final Panel Interview and that possibly being a factor in Quin's decision not to move her to the next level in the application process, is not direct evidence of discrimination. If the Court were to accept this, the Court would be accepting Thompson's subjective belief and inference that because she was evaluated while she was feeling ill, that unlawful discrimination occurred. In fact, it is possible that the panel was unaware that Thompson was not feeling well that day as Thompson admits that she never told the panel that she was not feeling well. (Thompson Dep. Document No. 35-1 at 23). Regardless of whether or not the panel was aware of how Thompson was feeling that day, her answers were still not sufficient to convince the panel that she was capable of moving on in the application process for the Director position. This is not direct evidence of sex and/or race discrimination.

Therefore, the Court concludes that Thompson's inadequate responses to questions posed during the final panel interview is a legitimate non-discriminatory reason for denying Thompson a promotion, to which there is no evidence of pretext or mixed motive attached.

### b. Feedback from Physician Stakeholders

In an affidavit submitted as an attachment to HCHD's Motion for Summary Judgment, Quin states that she was informed by some of the physician stakeholders that they were concerned that Thompson would be promoted because while she had been in a leadership role for many years, she had not produced significant results and they did not feel that she was a leader. (Quin Aff. Document No. 35-7 at 5). Dr. Venkata Bandi ("Dr. Bandi") affirmed this in his affidavit submitted with HCHD's Motion for Summary Judgment. Though he did not interview Thompson, he attests that his unbiased opinion of her stems from prior interactions with Force and his managerial personnel, and observations of daily operations in the RCD at Ben Taub. (Bandi Aff. Document No. 35-9 at 3). Dr. Bandi further attests that while he found Thompson very nice, personable, calm, and composed, he did not believe that she would be a strong leader nor did he have confidence that she would be able to make tough decisions while addressing patient care issues with Respiratory Therapists ("RT"). (Id at 3). During his deposition, Dr. Bandi demonstrated that he exercised objective analyses in weighing Thompson's strengths, "knowing the system well", and her weaknesses, "soft" and unsure if she would be able to make tough decisions. (Candidate Assessment Tool Document No. 35-12, 28-31). This assessment resulted in Dr. Bandi's conclusion that Thompson should not be given further consideration for the position. (Bandi Aff. Document No. 35-9 at 3).

Thompson disputes these concerns as being proffered reasons. In fact, in an affidavit submitted with her response to the Motion for Summary Judgment, Thompson testifies that she had produced significant results and that her communication skills were sufficient. Thompson testifies that in addition to coordinating and educating respiratory,

nursing and medical staff on respiratory equipment, modalities and other respiratory related subject matters, she developed a quality improvement program and an orientation program for the department and for new hires, respectively. (Thompson Aff. Document No. 41-6 at 4). Thompson also testifies that she implemented 12-hour shift staffing to improve efficiency and also improved the RCD's performance in the Emergency Center by requiring staff to obtain additional training. (Thompson Aff. Document No. 41-6 at 5). Thompson maintains that if she had not made any significant changes or improvements recently, it was due to the fact that Quin had since become the new Administrative Director leaving no further responsibilities for Thompson after that. (Thompson Aff. Document No. 41-6 at 8).

Further, Thompson points to the deposition testimony of Oddo who testified that Thompson's relationship with some of the physicians was good. In addition, Oddo testified that Ms. Thompson had a good relationship with the physicians and members of the team, was an excellent communicator with briefing on operations issues, and was an effective member of the management team. (Oddo Dep. Document No. 35-5 at 5).

Thompson's evidence of her improvements and changes made to the RCD is subjective to what the HCHD defines as significant results. Even if this evidence is true under HCHD standards, Thompson must show that sex or race was a motivating factor in not promoting her. Thompson has not brought forward any direct evidence of sex or race as components in her evaluation, and thus, neither sex nor race can be considered as motivating factors without any inferences or presumption.

Further, Ms. Thompson appears to find Oddo's affirmation of a positive relationship between herself and some of the physician stakeholders as proof that

HCHD's proffered reason of negative physician stakeholder feedback was in fact pretext and that her sex and race were motivating factors. The Court finds that while the subjective beliefs of Ms. Oddo seemingly paints a picture of a positive relationship between Ms. Thompson and the physicians and members of the team, this affirmation does not speak for the physician stakeholders' faith in her abilities to perform the responsibilities of her job. Therefore, the Court concludes that physician stakeholder feedback is a legitimate non-discriminatory reason for not promoting Thompson to which there is no evidence of pretext or mixed motive attached.

### c.   Quin's Knowledge of Thompson's Performance and/or her Previous Interactions with Thompson

As HCHD argues, Quin's main concerns with Thompson's past performance, which in part hindered her from promoting Thompson, stems from issues with staffing, productivity and decision-making. (Document No. 35-7 at 4). An independent vendor hired by HCHD to evaluate the RCD at Ben Taub showed that the RCD was underproductive. (Opp. Gap Analysis Document No. 35-7 Ex. A). The EKG department was also found to be performing at a low level of productivity upon the completion of a SWOT analysis. (Quin Aff. Document No. 35-7 at 2).

The combination of inadequate responses during the Final Panel Interview and past performance as an Operations Manager failed to convince Quin and the hiring panel that Thompson's ability to make tough leadership-related decisions would be satisfactory. (Quin Aff. Document No. 35-7 at 5).

Thompson asserts these reasons as subjective. In an affidavit submitted with Thompson's Response to HCHD's Motion for Summary Judgment, Thompson attests in

response to the allegations of low-level productivity, that the "patient acuity level was much higher than the peer groups because of uninsured illegal immigrants and low income populations who did not have routine health maintenance. Therefore, they sought health care as a last resort. Seeking health care at the last moment usually means the progression of the illness worsens to the point where ICU care is necessary, rather than general care, which could have been provided at the onset of illness". (Thompson Aff. Document No. 41-6 at 5-6). Thompson further attests that "Both BTGH [Ben Taub] and LBJ Respiratory department's productivity levels wavered when Medicare/Medicaid reimbursement procedures changed to exclude some of the procedures respiratory charged for, such as pulse oximetry monitoring and oxygen, and with the implementation of Epic, the electronic medical record system". (Thompson Aff. Document No. 41-6 at 5-6).

Additionally, Quin admitted in her deposition that she failed to inquire about Thompson's longevity with HCHD as she did not find it relevant to the position Thompson was applying for. (Quin Dep. Document No. 35-2 at 12). Quin further testified that she never sought Thompson's personnel file to ascertain her qualifications. (Quin Dep. Document No. 35-2 at 24). Quin testified that she expected that Thompson would communicate such information to the panel at the interview. (Id.) Thompson asserts that Quin's decisions were subjectively based, and therefore, should be viewed as pretext. However, subjectivity does not default to unlawful discrimination; there must be direct evidence of such discrimination for mere subjectivity to amount to pretext. *See Alvarez-Diemer v. Univ. of Tex. – El Paso*, 258 Fed.Appx. 689, 691 (5th Cir. 2007).

Thompson also included an affidavit of Force with allegations that Quin "tended to treat women differently and less favorably than men" and that it was posited that race was a component "involved in her actions and decisions toward minorities". (Force Aff. Document No. 41-5 at 4). Force's basis for these allegations appear to stem from his own observations that high level positions once held by minorities were now held by Caucasians. (Id). Moreover, Force's observations are not sufficient to qualify as pretext because he does nothing more than rely on his own inferences and presumption. Even if Force had statistical evidence to support his observations, such evidence would not be sufficient as to be considered pretext. The Fifth Circuit has stated that while statistical evidence "may be probative of pretext in limited circumstances" it " usually cannot rebut the employer's articulated nondiscriminatory reasons". *Chavarria v. Despachos Del Norte, Inc.*, 390 F.Supp.2d 591 (S.D. Tex. 2005) citing *E.E.O.C. v. Texas Instruments Inc.*, 100 F.3d 1173, at 1184-85 (5th Cir. 1996).

Even if Thompson's assertions disprove HCHD's proffered reason of low productivity levels, there is still no evidence of a pretext for sex or race discrimination. Thus, the court finds HCHD's preferred reason of Quin's knowledge of Thompson's performance and/or her previous interactions with her as legitimately non-discriminatory with no evidence of sex and/or race as a motivating factor.

### 2. Mixed Motive

Thompson's claims of sex and race discrimination are based on her own subjective beliefs about HCHD's reasons for not promoting her, not any concrete evidence. She therefore has not raised a genuine issue of material fact or pretext. As such, in order to defeat HCHD's Motion for Summary Judgment, Thompson is left to show that

her sex or her race was a motivating factor in HCHD's decisions. Again, Thompson has failed to provide summary judgment evidence that demonstrates that Thompson's sex or race was a motivating factor in her not receiving a promotion, or, that HCHD's legitimate, non-discriminatory reasons for Thompson not receiving the promotion were false or unworthy of credence. As discussed above, Force is the only person to imply that race and/or gender had any influence in the decisions made by Quin.  However, as also discussed above, Force's affidavit is based on his own admitted generalized observations, and is therefore not any evidence of discrimination that could support Thompson's claims.  Indeed, Thompson herself admits that Quin has never made any gestures or done anything to indicate that she was prejudiced against women or African Americans. (Thompson Dep. Document No. 35-1 at 9).  Given the absence of any evidence that race or gender was a factor that motivated Quin's decision not to select Thompson for the positions, the summary judgment evidence is insufficient to raise a material question of fact of mixed motive.

### IV.    Discussion—Constructive Discharge

Thompson has alleged a constructive discharge claim based on unlawful racial and sex discrimination. To prevail on such a constructive discharge claim, Thompson is required to show that her conditions were so difficult or unpleasant that a reasonable person in her shoes would have felt compelled to resign. *Machado v. Goodman Mfg. Co., L.P*, 10. F.Supp.2d 709 (S.D. Tex. 1997).

An employer commits a constructive discharge in violation of Title VII when an employee involuntarily resigns in order to escape intolerable and illegal employment requirements to which he or she is subjected to because of race, color, religion, sex, or

national origin. *See Young v. Southwestern Savings & Loan Association*, 509 F.2d 140, 144 (5th Cir. 1975) and *Borque v. Powell Electrical Manufacturing Co.*, 617 F.2d 61, 65 (5th Cir. 1980). In further determining if a constructive discharge has occurred, the Court considers relevant factors including: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger [or less experienced/qualified] supervisor; (6) badgering, harassment or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement [or continued employment on terms less favorable than the employee's former status]. *Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 342 (5th Cir. 2005), citing *Haley v. Alliance Compressor LLC*, 391 F.3d 644, 649-50 (5th Cir. 2004) (citing *Brown v. Kinney Shoe Alliance Compressor LLC*, 237 F.3d 556, 566 (5th Cir. 2001)).

Here, Thompson has failed to provide summary judgment evidence establishing that she was not promoted due to her sex or race. Thompson suffered a decrease in salary and was moved to a lower position due to HCHD's reorganization efforts.  However, such occurrences are neither intolerable nor illegal and Thompson has yet to show that she was subjected to this treatment due to her sex or race. Because Thompson has failed to establish that she was a victim of unlawful discrimination, Thompson also fails to establish that HCHD has committed a constructive discharge in violation of Title VII.

## V.   Conclusion and Order

Based on the foregoing, and the conclusion that the summary judgment evidence does not raise a genuine issue of material fact for trial, it is

ORDERED that Defendant's Motion for Summary Judgment (Document No. 35) is GRANTED, and Plaintiff's claims are DISMISSED on the merits.

Signed at Houston, Texas, this _6th_ day of _August_, 2013

FRANCES H. STACY
UNITED STATES MAGISTRATE JUDGE

22